[Civ. No. 24108.  First Dist., Div. Three.  Nov. 26, 1969.]

FREIGHTLINER CORPORATION, Cross-complainant and Appellant, v. ROCKWELL-STANDARD CORPORATION, Cross-complainant and Appellant.

## COUNSEL

Gudmundson, Siggins, Stone & Goff, W. W. Gudmundson and Richard G. Logan for Cross-complainant and Appellant Freightliner Corporation.

Richard A. Boyd, John E. Whiting and Cyril Viadro for Cross-complainant and Appellant Rockwell-Standard Corporation.

## OPINION

**CALDECOTT, J.**—The case out of which this action arose (*Bradford* v. *Mitchell Brothers Truck Lines,* nonpublished opinion, Court of Appeal, First District, Civ. No. 21836, February 9, 1966) resulted from a collision between a passenger car used by the Bradfords and a truck-trailer owned and driven by Kelly, but leased to and in the service of Mitchell Brothers at the time of the accident. The truck-trailer was equipped with a suspension system manufactured by Rockwell-Standard Corporation (Rockwell) and installed by Freightliner Corporation (Freightliner). Kelly and Mitchell Brothers were relieved of any liability and Rockwell and Freightliner were both found to be negligent in that action. Both Freightliner and Rockwell appealed on the grounds that the evidence was not sufficient to support the judgment. However, the judgment was affirmed on appeal, and in that opinion the evidence concerning the conduct of Rockwell and Freightliner was summarized as follows:

"The evidence shows that Rockwell manufactured the suspension system installed in the Kelly truck. It was designed by Rockwell for use in trucks that carry heavy cargoes. There was expert testimony that the precipitating cause of the accident was the failure of the right spring leaf suspension system on the Kelly truck, and that one of the two major causes for the spring's failure was its defective design. The chief engineer of Rockwell

testified that before the Bradford accident, Rockwell was aware that there had been 75 to 80 spring failures, two of which occurred in the same general area in which Kelly's spring failed. The same witness also testified that after learning of spring failures, Rockwell began a research project to find out what was wrong with its springs, and that its engineers ultimately concluded the failures were caused by an inadequate safety factor. There was also testimony that the spring failures indicated a defective spring system.

"There was evidence that Rockwell did not use the shotpeening process [footnote omitted] to harden or strengthen the steel used in its springs, and that it mistakenly used an inferior quality of steel in the manufacturing process. Despite knowledge that its spring suspension system was not functioning properly and that many failures had occurred, Rockwell made no effort to withdraw its springs from use, or to warn prospective purchasers of latent and dangerous defects in the springs. . . .

"Freightliner agreed with Kelly to rebuild his truck. It had the Rockwell suspension system on its premises for examination and inspection by prospective buyers and owners of trucks being rebuilt by Freightliner. Freightliner knew that the Rockwell suspension system was a new and novel unit, but it does not appear that Freightliner had knowledge of its actual performance or utility. Freightliner made no tests on the Rockwell unit to determine its reliability. Although Kelly saw a Rockwell system on Freightliner's premises, and ordered it, there is also evidence that Kelly relied upon Freightliner to install an adequate suspension system in his truck and that one of Freightliner's employees recommended the Rockwell 38,000 pound unit. Kelly ordered a 52 inch, 38,000 pound unit, but Freightliner, unknown to Kelly, installed a 50 inch, 32,000 pound unit. This gave Kelly a smaller safety factor than he had requested. Later, when a spring on the left side of the truck failed, Freightliner replaced it with a 34,000 pound unit, and made no change in the 32,000 pound unit on the right side of the truck. There was evidence that this disparity violated sound engineering practice. Finally, in tightening the U-bolts on the Rockwell units, Freightliner did not follow Rockwell directions, which were to tighten the bolts to 1180 foot pounds, but rather tightened the bolts manually, and made no tests, and had no equipment for making tests to determine if the U-bolts had been secured by the recommended strength. There was evidence that failure to keep the U-bolts tight will result in movement in the springs and may cause the springs to fail in the area of the U-bolt holes, and that in the Kelly truck the left spring leaf failure was caused by a failure to properly tighten the U-bolts."

The negligence of both Freightliner and Rockwell was held to be the proximate cause of the injuries to the Bradfords.

Both Freightliner and Rockwell filed cross-complaints against each other, each seeking indemnification from the other for the half of the total judgment that it paid. Each cross-defendant made a motion for summary judgment in its favor. Both motions for summary judgment were granted on the basis that the record established that each party was guilty of active negligence and therefore there was no triable issue between the parties. Each party appeals.

Rockwell stated in its brief "We frankly took this appeal only because Freightliner had previously appealed from the summary judgment in our favor. . . . If this court should so hold (on Freightliner's appeal), we hereby ask it to reverse both judgments and, to the extent necessary to support that position, we hereby adopt Freightliner's opening brief as our own." In view of Rockwell's position on appeal the court will discuss the Freightliner case, but the discussion will apply to both appeals.

## I

Freightliner contends that the doctrine of collateral estoppel does not apply to the issues raised by Freightliner's cross-complaint against Rockwell for indemnification because the parties were merely codefendants in the main action rather than adversaries. This contention is without merit.

If Freightliner and Rockwell were merely codefendants in the original action, the judgment was not rendered between them, and it is not an estoppel. However, if the co-parties are actually opposed and litigate issues adversely to each other, the doctrine of collateral estoppel should apply. (See 3 Witkin, Cal. Procedure (1954), p. 1956.) In most personal injury cases involving two or more defendants, even where no issue is framed between the codefendants by the pleadings, they nevertheless have adverse interests and each has the right to cross-examine witnesses and to put in evidence that his codefendant was solely responsible for any damages. "As every trial lawyer knows, the real battle on the liability issues is often that between the codefendants. . . . Further, there is often the possibility of a future claim for indemnity or contribution by one codefendant against another arising out of a judgment against both, and this points up even more sharply the essentially adversary character of their relationship in the first suit." (James, Jr., Fleming, Civil Procedure, pp. 586-587.)

The adversary nature of the relationship of codefendants was recognized in *Fidelity & Cas. Co. of New York* v. *Federal Express* (6th Cir. 1943) 136 F.2d 35, 38-39: "Co-parties who are not adversaries, may be bound by a judgment in a subsequent controversy between each other where they, in fact, occupied, in the prior trial, the attitude of adversaries. . . . [T]he formal arrangement of parties on the record is unimportant, so that if co-parties on the record were, in fact, adversaries on an issue, and the issue

was actually litigated, and they had full opportunity to contest it with each other . . ., co-parties are concluded by adjudication of that issue in a subsequent controversy between each other. [Citation]"

In the present case the trial judge recognized that the issue of negligence was fully litigated in the trial of the main action. Rockwell even acknowledged that both Freightliner and Rockwell had, and took full advantage of, the opportunity to litigate the issues concerning their own negligence. ▮ Therefore, since the issues as to the negligence of both parties were fully litigated in the trial of the main action, the doctrine of collateral estoppel should apply to preclude them from having an opportunity to relitigate them.

The cases cited by Freightliner are clearly distinguishable from the present case. In each of those cases the court pointed out that the parties were not adversaries. As stated in one of the cases cited by Freightliner, *Great Western Furniture Co.* v. *Porter Corp.,* 238 Cal.App.2d 502 at p. 511 [48 Cal.Rptr. 76], in distinguishing *Fidelity & Cas. Co. of New York* v. *Federal Express, supra,* "Fidelity was held estopped by the prior judgment because the two sets of defendants had actually litigated the issue of negligence with each other, each claiming that the death was caused by the other's sole negligence." This is the situation in the present case, each party claiming the other was negligent and the doctrine of collateral estoppel is applicable between the parties.

## II

The motion for summary judgment of cross-defendant Rockwell was based, in part, upon the reporter's transcript of the testimony at the trial of the main action and the opinion of the Court of Appeal in that action. In granting the motion for summary judgment the trial court, after summarizing the acts of negligence as stated by the appellate court in the main action, concluded that both Freightliner and Rockwell were guilty of active negligence and therefore there were no triable issues of fact between the parties.

In *King* v. *Timber Structures, Inc.,* 240 Cal.App.2d 178, 182 [49 Cal.Rptr. 414], the court differentiated between active negligence and passive negligence as follows: "The difference between the two kinds of negligence is simply that one is passively negligent if he merely fails to act in fullfillment of a duty of care which the law imposes on him. . . . One is actively negligent if he participates in some manner in the conduct or omission which caused the injury."

An examination of the appellate court opinion in the appeal of the main case indicates that the trial judge was justified in concluding, as a matter of

law, that both parties were guilty of active negligence and therefore there were no triable issues of fact between the parties.

We do know from the verdict in the main action that the jury must have found both Freightliner and Rockwell guilty of negligence. We do not know upon which of the alleged negligent acts the jury based its verdict. However, whichever act of negligence the jury found to exist would be immaterial for each act would be sufficient to support the verdict, and each constituted active negligence. Thus there was no triable issue between the parties and the motion for summary judgment as to each party was properly granted.

The judgment is affirmed.

Draper, P. J., and Brown (H. C.), J., concurred.

A petition for a rehearing was denied December 26, 1969, and the petition of appellant Freightliner Corporation for a hearing by the Supreme Court was denied January 21, 1970.